CHARLES W. MILLER
**MILLER & FALKNER**
Waterfront Plaza, Suite 2104
325 West Main Street
Louisville, KY 40202
Telephone: (502) 583-2300
Facsimile: (502) 583-2323
Email: cmiller@millerfalknerlaw.com

*Local Counsel for Plaintiff Blaze B. Huston*

KIM MILLER
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

LEWIS KAHN
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

*Counsel for Plaintiff Blaze B. Huston*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

|  |  |
|---|---|
| BLAZE B. HUSTON, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.  3:10cv-540-S |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| ALMOST FAMILY, INC., WILLIAM B. YARMUTH, and C. STEVEN GUENTHNER, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

1.   This is a federal securities fraud class action on behalf of persons and entities who purchased or otherwise acquired the common stock of Almost Family, Inc. (the "Company") between August 5, 2009, and June 30, 2010, inclusive (the "Class Period"), and were damaged thereby. The claims asserted herein arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The claims are against Almost Family and its top executive officers who made materially false and misleading statements during the Class Period.

## INTRODUCTION AND OVERVIEW

2.   Almost Family claims to be "a leading regional provider of home health services," with locations in Florida, Kentucky, Connecticut, New Jersey, Ohio, Massachusetts, Alabama, Missouri, Illinois, Pennsylvania, and Indiana. Almost Family operates in two segments, one, the Visiting Nurse ("VN") segment, which "provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care" and generates revenue on a "per episode" basis, and another that type of services, the Personal Care ("PC") segment, which are also provided in patients' homes, "(generally provided by paraprofessional staff such as home health aides) [and] are generally of a custodial rather than skilled nature." PC revenues are generated on an hourly basis.

3.   Much of the Company's revenue – more than half quarterly for each segment, and usually around 90% for the VN segment – is generated from the Medicare Program, while the balance is generated from Medicaid and private insurance programs.

4.   During the Class Period, defendants issued materially false and misleading statements regarding the Company's operations and its business and financial results and outlook. Defendants inflated Almost Family stock by failing to disclose that they were artificially inflating Almost Family's revenue and sales by billing patients for the more profitable in-home services – for which the Company would receive higher reimbursement rates from Medicare – regardless of patients' need for those more expensive services.

5.   As a result of defendants' materially false and misleading statements and omissions, Almost Family's common stock traded at artificially inflated prices during the Class Period, reaching a high of $43.96 per share on April 29, 2010.

6.   On April 26, 2010, *The Wall Street Journal* published an article entitled "Home Care Yields Medicare Bounty." The article accused four home healthcare companies, including Almost Family, of taking advantage of the Medicare reimbursement system. The article revealed that Almost Family and other home healthcare companies like it were suspected of billing a suspiciously-high number of the most profitable home therapy visits for their Medicare patients, as compared to the less profitable therapy visits, which were billed far less frequently. In particular, Defendants increased the number of visits beyond patients' needs or tied the number of visits to Medicare incentive benchmarks in order to take advantage of incentives that were designed to deter home healthcare companies from cutting corners and limiting service.

7.   The truth began to be revealed to investors over two partial disclosures beginning with a May 13, 2010, release revealing that the U.S. Senate Finance Committee had begun an investigation into Almost Family and other home healthcare companies. That release discussed a letter from Finance Committee Chairman Max Baucus and Ranking Member

Chuck Grassley to Almost Family questioning the connection between the number of home health therapy visits and the Medicare reimbursement rates for those visits. The letter requested, *inter alia*, that Defendants "answer questions related to their internal policies and guidelines regarding the number of visits . . . and the rate of reimbursements" and "provide marketing materials and guidelines for patients and physicians as well as clinical criteria used in developing those materials."

8.  On July 1, 2010, Almost Family announced that the Company had received a notice of investigation from the SEC and a civil subpoena seeking documents relating to "the Company's home health care services and operations, including reimbursements under the Medicare home health prospective payment system, since January 1, 2000."

9.  As a result of these two disclosures, Almost Family's common stock fell from a Class Period high of $44.12 to close at $31.05 at the end of the Class Period.

## JURISDICTION AND VENUE

10. This action arises under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11. Jurisdiction is conferred by 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1391(b). Defendant Almost Family maintains its principal place of business within this District, and the Individual Defendants conduct business in and many of the acts giving rise to the violations alleged herein, including the preparation and

dissemination of materially false and misleading information and omissions, occurred in substantial part in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14. Plaintiff Blaze Huston, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Almost Family at artificially inflated prices during the Class Period and has been damaged thereby.

### Company Defendant

15. Defendant Almost Family is incorporated in Delaware and maintains its principal executive office in Louisville, Kentucky. Almost Family has branch locations in Florida, Kentucky, Connecticut, New Jersey, Ohio, Massachusetts, Alabama, Missouri, Illinois, Pennsylvania, and Indiana.

### Individual Defendants

16. Defendant William B. Yarmuth, is, and was at all relevant times, President, Chief Executive Officer, and Chairman of the Board of the Company.

17. Defendant C. Steven Guenthner, is, and was at all relevant times, Senior Vice President and Chief Financial Officer of Almost Family. During the Class Period, Guenthner sold 20,000 shares of his personally held shares of Almost Family stock at artificially inflated prices while in possession of material adverse information for proceeds of more than $840,000.

18. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Almost Family's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

19. The Class Period begins on August 5, 2009. On that date, Almost Family issued a press release announcing its "financial results for the three months ended June 30, 2009" ("2Q:09"). The release stated, in relevant part,

> We're pleased to report strong operating results for the second quarter. In the midst of great public debate about health care reform, we're continuing to demonstrate that home health care represents the lowest cost, highest quality way to keep the frail homebound elderly out of high cost institutional care and in their homes where they want to be. Over the course of 2009 we plan to continue our strategic efforts to grow and expand our business. We also plan to work hard to help the Administration, Congress and all those working on comprehensive health care reform understand how important home health care is as a part of the solution to lowering health care costs and ensuring access to care for all America's seniors.

20. Also in the August 5, 2009, press release, the Company announced, *inter alia*, "net service revenues of $74.9 million, a 54% increase" from the same quarter of the previous year, as well as net income of $6 million, compared to $3.9 million for the

previous year. For the six-month period ended June 30, 2009, "Almost Family reported net service revenues . . . of $144.1 million, a 64% increase from . . . the same period of 2008, and net income of $11.6 million," well over the $6.5 million in the same six month period of 2008.

21. The Company also filed with the SEC its quarterly Form 10-Q for 2Q:09 on that day. This 10-Q was signed by Defendants Yarmuth and Guenthner and reiterated the rapidly-climbing financial results announced in the Company's press release.

22. In addition, the 2Q:09 10-Q stated that the Company's net revenues stemmed primarily from "federal and state third-party reimbursement programs, commercial insurance companies and patients." The 10-Q went on to state:

> Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.
>
> Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. It is common for issues to arise related to: 1) medical coding, particularly with respect to Medicare, 2) patient eligibility, particularly related to Medicaid, 3) the determination of cost-reimbursed revenues, and 4) other reasons unrelated to credit risk, all of which may result in adjustments to recorded revenue amounts. Management evaluates the potential for revenue adjustments and when appropriate provides allowances for losses based upon the best available information. There is at least a reasonable possibility that recorded estimates could change by material amounts in the near term.

23. The Company also issued purported "Cautionary Statements" in its 10-Q regarding these reimbursements, noting that certain "factors [] may cause may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements," listing as risks, in part:

- changes in Medicare reimbursement levels, including, if enacted, those changes outlines in President Obama's proposed budget for the Federal 2010 fiscal year; [and]

- changes in Medicaid reimbursement levels;

24. Defendants repeated the statements identified in ¶¶19-23 above in their 10-Qs filed on November 4, 2009, for the three months ending September 30, 2009 ("3Q:09") and April 29, 2010, for the period ending March 30, 2010 ("1Q:10") (collectively, with the 2Q:09 10-Q, the "Class Period 10-Qs") and in their annual report for the fiscal year ended December 31, 2009 ("2009 10-K"), filed February 25, 2010.

25. Regarding Almost Family's revenue from its two segments, Defendants reported in the Company's 2Q:09 10-Q:

> The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). Reportable segments have been identified based upon how management has organized the business by services provided to customers and the criteria in ASC 280, Segment Reporting.
>
> The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 89% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.
>
> The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 65% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

26. Defendants made substantially similar statements regarding revenue from its two segments in the other Class Period 10-Qs: The Company's 3Q:09 10-Q reported that 90% of VN revenues and 66% of PC revenues were from Medicaid and the Company's 1Q:10 10-Q reported that 92% of VN revenues and 68% of PC revenues were from Medicaid.

27. Attached as exhibits to the Class Period 10-Qs and 2009 10-K were certifications signed by Defendants Yarmuth and Guenthner, pursuant to the Sarbanes-Oxley Act of 2002

("SOX"), stating that each Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

28. In the Company's 3Q:09 press release, filed November 4, 2009, Defendants once again touted the Company's "record operating results," including, for example, net service revenues that increased 31% and net income that rose from $4.7 million to $6.2 million from the same quarter of the previous year. For the nine months ending September 30, 2009, Almost Family reported a 51% year-over-year increase in net service revenue and a year-over-year increase in income from $11.1 million to $17.8 million.

29. Also in the November 4, 2009, release, Defendant Yarmuth stated, in relevant part:

> We're very pleased to once again report record operating results, especially in what is seasonally a down quarter in our Florida markets. Despite the immense amount of noise surrounding Federal health care reform activities, our managers have maintained their focus on our patients and referral sources to achieve these results. Whatever the outcome of the current health care reform efforts might bring, we are positioning our Company to thrive and grow as a major consolidator in the home health care industry.

30. Defendants also addressed the stock offering conducted by the Company in 3Q:09, noting that "the Company sold 967,556 shares of its common stock in a series of open market transactions at a weighted average price of $29.71. Net proceeds of approximately $28 million were used to repay obligations under the Company's bank credit facility. As of September 30, 2009, the Company had approximately $10 million in cash on hand."

31. Again, on February 24, 2010, Almost Family issued a press release announcing its financial results for the three months and full year ended December 31, 2009. Those results included:

### Fourth Quarter Financial Results

Almost Family reported fourth quarter 2009 net service revenues of $78.0 million, an 18.4% increase from $65.9 million in the fourth quarter of 2008.

Net income for the fourth quarter of 2009 was $6.8 million, or $0.73 per diluted share, compared to $5.2 million, or $0.62 per diluted share, in the fourth quarter of 2008. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 11% between periods. Results for the quarter included costs of $238,000 or $0.03 per diluted share related to a terminated acquisition.

### Fourth Quarter Segment Results

Net revenues in the Visiting Nurse segment for the fourth quarter of 2009 were $67.6 million, a 22% increase from $55.7 million in the fourth quarter of 2008. The total revenue growth of $12.0 million came from a 19% organic growth rate plus $1.3 million from acquired operations. Organic Medicare admissions growth was 13% and organic Medicare Episodic growth was 18%. Operating income before corporate expense in the VN segment for the fourth quarter of 2009 was $14.9 million, an 18% increase from $12.6 million in the fourth quarter of 2008.

Net revenues in the Personal Care (PC) segment for the fourth quarter of 2009 were $10.4 million, a 2% increase from $10.2 million in the fourth quarter of 2008. Operating income before unallocated corporate expense in the PC segment for the fourth quarter of 2009 was $1.5 million, a 14% increase from $1.3 million in the fourth quarter of 2008.

### Full Year Financial Results

Almost Family reported net service revenues for the twelve month period ended December 31, 2009 of $297.8 million, a 41% increase from $211.5 million in the same period of 2008.

Net income for the twelve month period of 2009 was $24.6 million, or $2.86 per diluted share, compared to $16.3 million, or $2.16 per diluted share, in the twelve month period of 2008. Results for the twelve month period of 2009 included acquisition transactions costs of $463,000 or $0.06 per diluted share.

### Full Year Segment Results

Net revenues in the Visiting Nurse segment for the twelve month period of 2009 were $256.1 million, a 48% increase from $173.0 million in the twelve month period of 2008. The total revenue growth of $83.1 million came from a 29% organic growth rate plus $43.8 million from acquired operations. Operating income before corporate expense in the VN segment for the twelve month period of 2009 was $53.8 million, a 47% increase from $36.6 million in the same period of 2008.

Net revenues in the Personal Care (PC) segment for the twelve month period of 2009 were $41.8 million, an 8% increase from $38.5 million in the twelve month period of 2008. Operating income before unallocated corporate expense in the PC segment for the twelve month period of 2009 was $5.2 million, a 37% increase from $3.8 million in the twelve month period of 2008.

32. Also in the February 24, 2010, press release, Defendant Yarmuth once again touted the Company's success, stating:

Our fourth quarter results serve to top off another milestone year in the development of our Company. During 2009, we, along with other home health industry leaders, devoted substantial time and attention to national health care reform activities. We feel we made great strides in improving the perception of home health care in the minds of legislators and other policy makers. Against this backdrop, our management team and over 6,000 caregivers continued their uncompromising focus on providing high quality home care to our patients and quality returns for our shareholders. Our fourth quarter and full year results demonstrate our continued ability to generate organic revenue and earnings growth. With our strong balance sheet and our position as one of the nation's larger providers we believe we are well positioned for continued growth both organically and as a consolidator in our industry.

33. That same day, Defendants hosted a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made numerous positive statements about the Company's business, operations, and prospects.

34. On February 25, 2010, Defendants filed with the SEC the Company's 2009 10-K, which stated, in relevant part:

*Medicare Rates*

On October 1, 2000, Medicare implemented the Prospective Payment System ("PPS") and began paying providers of home health care at fixed, predetermined rates for

services and supplies bundled into 60-day episodes of home health care. An episode of home health care spans a 60-day period, starting with the first day a billable visit is furnished to a Medicare beneficiary and ending 60 days later. If a patient is still in treatment on the 60th day a new episode begins on the 61st day regardless of whether a billable visit is rendered on that day and ends 60 days later. The first day of a consecutive episode, therefore, is not necessarily the new episode's first billable visit. A base episode payment is established by the Medicare Program through federal legislation for all episodes of care ended on or after the applicable time periods detailed below:

| Period | Base episode Payment (1) | |
|---|---|---|
| January 1, 2007 through December 31, 2007 | $ | 2,339 |
| January 1, 2008 through December 31, 2008 | $ | 2,270 |
| January 1, 2009 through December 31, 2009 | $ | 2,272 |
| January 1, 2010 through December 31, 2010 | $ | 2,313 |

_____

(1)   The actual episode payment rates, as presented in the table vary, depending on the home health resource groups ("HHRGs") to which Medicare patients are assigned and the per episode payment is typically reduced or increased by such factors as the patient's clinical, functional, and services utilization characteristics.

Under PPS for Medicare reimbursement, we record net revenues based on a reimbursement rate that varies based on the severity of the patient's condition, service needs and other related factors. We record net revenues as services are rendered to patients over the 60-day episode period. At the end of each month, a portion of our revenue is estimated for episodes in progress.

Medicare reimbursement on an episodic basis, is subject to change if the actual number of therapy visits differs from the number anticipated at the start of care or if the patient is discharged but readmitted to another agency within the same 60-day episodic period. Our revenue recognition under the Medicare reimbursement program is based on certain variables including, but not limited, to: (i) changes in the base episode payments established by the Medicare Program; (ii) adjustments to the base episode payments for partial episodes and for other factors, such as case mix, geographic wages, low utilization and intervening events; and, (iii) recoveries of overpayments. Adjustments to revenue result from differences between estimated and actual reimbursement amounts, an inability to obtain appropriate billing documentation or authorizations acceptable to the payor and other reasons unrelated to credit risk. We recognize Medicare revenue on an episode-by-episode basis during the course of each episode over its expected number of visits.

In October 2009 the Centers for Medicare & Medicaid Services ("CMS") published regulations specifying Medicare home health reimbursement rates for 2010. Medicare rates for 2010 include a "market basket update" rate increase of 2.0% plus a 2.5% "outlier policy" adjustment less a 2.75% "case mix creep" adjustment. Accordingly, 2010 Medicare rates are about 1.75% higher than in 2009.

Refer to the "Risk Factors" below, the "Notes to the Consolidated Financial Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information.

### Medicaid Reimbursement

As shown in "Compensation for Services" above, approximately 17% of our 2009 revenues were derived from state Medicaid and Other Government Programs, many of which currently face significant budget issues. The financial condition of the Medicaid programs in each of the states in which we operate is cyclical and many may be expected from time to time to take actions or evaluate taking actions to control the rate of growth of Medicaid expenditures. Among these actions are the following:

- redefining eligibility standards for Medicaid coverage
- redefining coverage criteria for home and community based care services
- slowing payments to providers by increasing the minimum time in which payments are made
- limiting reimbursement rate increases
- increased utilization of self-directed care alternatives
- shifting beneficiaries from traditional coverage to Medicaid managed care providers
- changing regulations under which providers must operate.

The actions that might be taken or considered are because the number of Medicaid beneficiaries and their related expenditures are growing at a faster rate than the government's revenue. Medicaid is consuming a greater percentage of states' budget. This issue is exacerbated when revenues slow in a slowing economy. We believe

that these financial issues are cyclical in nature rather than indicative of the long-term prospect for Medicaid funding of health care services. Additionally, we believe our services offer the lowest cost alternative to institutional care and are a part of the solution to the states' Medicaid financing problems. It is possible that actions taken by the state Medicaid programs in the future could have a significant unfavorable impact on our results of operations, financial condition and liquidity.

35. The Company's 2009 10-K also represented that Defendants followed a "Code of

Ethics and Business Conduct that applies to all its directors, officers . . . and employees,"

stating, for example, that the Company would "Provide Accurate and Complete Documentation" regarding its client care, "Always Obey the Law," and "Generate Accurate Billing and Claims" "reflecting that services rendered [,] supported by relevant documentation and [] submitted in compliance with applicable laws, rules, regulations and program requirements."

36. On April 26, 2010, *The Wall Street Journal* published an article entitled "Home Care Yields Medicare Bounty." The article called into question whether Almost Family and its competitors had experienced rapid growth by taking care of Medicare's incentives for frequent visits. The article posited that Almost Family and companies like it were increasing the number of in-home visits for patients without regard to the patients' needs. The article stated, in part:

> [A]n analysis by The Wall Street Journal of Medicare payments to home health-care companies in recent years raises questions about whether some companies – including the sector's largest, Amedisys Inc. – are taking advantage of the Medicare reimbursement system. The results show that the number of in-home therapy visits tracks Medicare financial incentives.
>
> *        *        *
>
> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.
>
> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys' patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits. "I was told „we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in

Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment. "The tenth visit was not always medically necessary," Ms. Trusler says.

\*       \*       \*

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008. The pattern of clustered visits around reimbursement targets is continuing:

MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008. During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

\*       \*       \*

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

\*       \*       \*

To conduct its analysis, The Journal enlisted Henry Dove, a professor at Yale University's School of Public Health and an expert in analyzing Medicare data. Mr. Dove mined Medicare's database to determine how often between 2005 and 2008 various home-health companies sent therapists to patients' homes during a

14

60-day period of care, and whether the number of visits coincided with Medicare financial incentives.

Mr. Dove found the pattern of clustering visits at reimbursement trigger points was industry wide. The three other publicly traded home-health companies saw similar movements from 2007 to 2008. LHC Group Inc., for instance, saw the percentage of patients getting 10 visits in 2008 drop by 64% from 2007. For Gentiva Health Services Inc., the 10-visit percentage fell 27%, and at Almost Family Inc., the percentage fell 39%.

*     *     *

Steven Guenthner, chief financial officer of Almost Family, said that when Medicare revised its reimbursement rates in 2000 – creating a bonus of about $2,200 for patients reaching 10 therapy visits – the policy had "a serious flaw." The rates encouraged home health agencies, including Almost Family, to seek out patients who had illnesses that required at least 10 visits, Mr. Guenthner said. Almost Family focused on hip and knee problems because those patients tend to need 10 to 13 therapy visits, he said.

Illnesses that require fewer visits may not get as much attention under the Medicare reimbursement rules. "It's not that we turned down patients," Mr. Guenthner said. "It's where you focus your scarce resources." The combination of limited home health resources to attract patients and the government's reimbursement policy "was like a moth to a flame," he said.

37. As a result of Defendant Guenthner's reassurances in the article that the Company acted appropriately by merely focusing its "scarce resources" where the government incentives made services more profitable, Almost Family stock remained stable.

38. To further reassure investors and keep the materially adverse truth under wraps, on April 28, 2010, Almost Family issued a press release announcing its financial results for 1Q:10. In that release, Defendant Yarmuth stated:

We're very pleased to report our first quarter operating results which truly highlight the strength of our underlying core business. Our VN segment generated 20% organic revenue growth over the same quarter last year. . . . The recent passage of health care reform legislation now provides us with reasonable reimbursement visibility for the next three years. Combined with our strong financial condition and access to additional capital, this reimbursement clarity positions us to take advantage of our acquisition opportunities which have largely been on hold for the past year.

39. Also in that April 28, 2010, press release, the Company announced 1Q:10 results including:

- net service revenues of $81.8 million, an 18.6% increase from $68.9 million in the first quarter of 2009.

- Net income of $7.4 million, compared to $5.6 million, in the first quarter of 2009.

- Net revenues in the VN segment of $71.5 million, a 22% increase from $58.7 million in the first quarter of 2009.

- Operating income before corporate expense in the VN segment of $15.9 million, a 30% increase from $12.2 million in the first quarter of 2009.

- Net revenues in the PC segment of $10.2 million.

- Operating income before unallocated corporate expense in the PC segment of $1.3 million, a 13% increase from $1.1 million in the first quarter of 2009.

40. Defendants again conducted a conference call on the day of this press release, during which they made positive statements about the Company's business, operations, and financial prospects. When asked about the April 26, 2010, *Wall Street Journal* article, Defendant Yarmuth diverted investors' attention from any wrongdoing, stating, in part:

> . . . I think Steve had a quote in there that said that he thought that the reimbursement system was – had some serious flaws in it. And I think we sort of believe that the article had some serious flaws in it also in terms of its – some of the numbers and the issues.

> We did not to my knowledge confirm or agree with the data that was presented to us in that article. But generally, I think our read of the article was essentially . . . that the federal government realized that the reimbursement system had some flaws in it from 2000 and that they put – changed the reimbursement system in 2008.

41. Defendant Yarmuth claimed that, as a result of the incentive increase designed to protect potentially underserved patients, "the industry responded, as we did, in terms of

taking care of patients . . . who we otherwise did not take care of in the previous year,"

going on to state, in part:

> So we were taking care of a lot of different people in 2008 than we were taking care of in 2007 who had different medical conditions and different clinical needs and different needs – levels of service. And we, as we always do, go about trying to provide the care that the patient needs based upon their clinical condition. And I think that the – in some ways the industry responded to what the government wanted the industry to do. And I think there are people that are being cared for now that maybe weren't being cared for before. And that's a good thing. And there's more people that are being cared for now than there were before, and that's good thing. . . . So I think there were some implications in the article that were not necessarily . . . true. And I think if you really look at the article you'll see that what happened . . . providers typically respond to those objectives that the government creates a reimbursement system. . . .And it's pretty simple. And I think . . . our position [] is the government wanted to create a greater distribution of care across a broader basis of people who are in need, and the industry responded.

42. The statements made by Defendants during the Class Period were materially false

and misleading when made because Defendants knew or recklessly disregarded that:

> a. the Company's "record" and "strong" operating results each quarter were not a result of the Company's "high quality" care, "strategic efforts to grow and expand," or "focus on [the Company's] patients and referral system," but instead a result of Defendants' fraudulent scheme to inflate Company revenues, and thus Company stock, by billing patients for services for which Almost Family would receive the most profitable Medicare reimbursement rates, regardless of the patients' need for these services.

> b. Defendants took advantage of Medicare incentives that provided extra fees for increasing numbers of at-home therapy visits – designed so that agencies wouldn't withhold needed services – by tying the number of patient visits to the Medicare incentive benchmarks and/or providing excessive in-home therapy visits.

> c. the Company's public statements regarding revenue recognition, including, for example, the percentage of revenue generated from Medicare and government programs, the "[l]aws and regulations governing the Medicare and Medicaid programs," and the revenue risks associated with those programs, omitted material information regarding Almost Family's failure to comply with the regulations governing Medicare programs and regarding the revenue inflation the Company experienced by over-billing for high-profit services to take advantage of Medicare billing incentives.

    d.   Defendants had not ensured that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact," as represented in their SOX certifications, because they knowingly and/or recklessly included false and misleading statements and omitted material facts in order to continue fraudulently billing Medicare thereby increasing revenues and inflating Company stock.

    e.   Defendants were in violation of the federal securities laws and their own Code of Ethics and Business Conduct because they failed to provide accurate and complete documentation regarding client care, obey the law, or generate accurate billing claims, and instead, billed patients for therapy based on profitability, reimbursements, and billing incentives, rather than patient need.

43. On May 12, 2010, shortly after these materially false and misleading statements were made and the day before the truth began to be revealed, Defendant Guenthner, while in possession of materially adverse information, sold 20,000 shares of his Almost Family stock at $42.04 per share, reaping proceeds of approximately $840,000.

### THE TRUTH IS REVEALED OVER MULTIPLE PARTIAL DISCLOSURES

44. The materially adverse truth about Almost Family's fraudulent conduct and business prospects began to be revealed to investors on May 13, 2010, through a Senate Committee release stating that it had started an investigation into the Company and announcing that it would "Question For-Profit Home Health Agencies on Relationship Between Operating Procedures and Reimbursements." The release further stated that "[f]inance leaders begin investigation after data suggests agencies intentionally increased the frequency of home health visits to trigger higher reimbursement rates."

45. The May 13, 2010, Senate Committee release stated, in relevant part:

Baucus and Grassley also questioned the companies regarding their promotional material, after the Committee obtained a patient questionnaire that appeared to be designed to help the company target Medicare patients for which it could be reimbursed.

"Too many Americans count on Medicare to provide quality health care to allow the program to be manipulated for somebody else's profit," said Baucus. "If for-profit companies want to work with the Medicare program, we have to hold them

to a very high standard. Companies that work with Medicare should not be allowed to target seniors just because they have Medicare or adjust the way they care for patients simply to increase profits. I intend to closely review the practices of these and all companies working with the Medicare program to stop fraud, waste and abuse and ensure every dollar is used appropriately."

"Every dollar wasted is taken away from Medicare beneficiaries," Grassley said. "We need to make sure care is provided based on patients' best interests, not profit margins. So far, it appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both. As the Senate committee of jurisdiction, we're working to figure out what's going on."

The Senators asked Amedisys, Almost Family, Inc., Gentiva Health Services, Inc., and the LHC Group, Inc. to answer questions related to their internal policies and guidelines regarding the number of visits provided to each patient, after data indicated a connection between the number of visits and the rate of reimbursement.

46. The May 13, 2010, release also revealed the content of the Senate Subcommittee's May 12, 2010, letter to Defendant Yarmuth, which stated, in part:

From 2000 through 2007, under the Medicare home health prospective payment system (PPS), home health agencies received an additional $2,200 in addition to the base reimbursement rate when HHAs made over nine therapy visits. During this period, the *Wall Street Journal*, reported that the number of patients a certain home health company visited 10 times was three times higher than the number of beneficiaries visited nine times. In fact, a former employee of this home health company stated that she had to "have ten visits to get paid" and "the tenth visit was not always medically necessary."

Starting in 2008, CMS revised home health PPS rules to provide additional payments at six, 14, and 20 therapy visits. These additional payments also became graduated within these intervals. The home health industry apparently changed their utilization patterns as a result of these payment policy changes. In March 2010, the Medicare Payment Advisory Commission (MedPAC) found:

In 2008, the share of therapy episodes with decreased payments under the new system – those in the range of 10 to 13 therapy visits – dropped by about one third. . . . Conversely, volume increased for therapy episodes that have higher payment under the revisions. For example, in 2008 payment episodes with six to nine visits increased by 30 percent, and the share of the these episodes increased from 9 percent to 12 percent. At the higher end of the visit distribution, payment for episodes with 14 or more therapy visits increased by 26 percent, and the share of these episodes increased from 12 percent to 15 percent. The immediate change in utilization demonstrates that home health providers can quickly adjust services to payment changes in the therapy visit thresholds.

According to an analysis by the *Wall Street Journal*, therapy visits by one of the leading home health companies followed these shifts. Apparently, the percentage of patients getting 10 therapy visits from one home health company dropped by 64 percent in 2008 from 2007. Also, the percentage of "patients of another home health company getting 10 visits dropped by 50 percent, while the percentage that got six visits increased 8 percent. The percentage of patients getting 14 visits rose 33 percent and the percentage getting 20 visits increased 41 percent."

The findings reported in the Wall Street Journal article are of great concern to us, especially since they appear to be confirmed by MedPAC's research. These findings suggest that HHAs are basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients.

47. In connection with this Senate investigation, Almost Family was asked to provide data regarding its Medicare billing, marketing materials, patient and physician guidelines and clinical criteria, *inter alia*, for 2006 through 2009.

48. On May 13, 2010, *The Wall Street Journal* published an article providing additional information regarding the investigation of Almost Family for its Medicare billing practices. The article stated, in part:

The Senate Finance Committee launched an investigation into the practices of Amedisys Inc., the nation's largest home health-care company, and three other companies that provide in-home therapy visits reimbursed by Medicare.

The committee is investigating whether the companies deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements.

A Wall Street Journal article last month described how the companies' Medicare patients received a high number of the most profitable therapy visits, but few of the least profitable ones.

The three other home health companies are LHC Group Inc., Gentiva Health Services Inc. and Almost Family Inc. Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D., Mont.), chairman of the finance committee, in a statement.

"It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R.,

Iowa), ranking member of the committee. "We're working to figure out what's going on."

The home therapy numbers cited in the article, which came from publicly available Medicare claims, "suggest home health agencies intentionally increased utilization for the purpose of triggering higher reimbursements," the senators wrote in letters that were emailed Wednesday to the chief executives of the four companies.

Almost Family didn't provide comment. Representatives for LHC, Gentiva and Amedisys said they would cooperate with the probe.

The inquiry letters ask each CEO to provide information on their companies' therapy visits from 2006 through 2009 and about financial relationships with referring physicians.

49. Also on May 13, 2010, Almost Family responded to the investigation by issuing a press release stating:

> Almost Family, Inc., a leading regional provider of home health nursing services, has received an inquiry letter from the U.S. Senate Finance Committee regarding an article in the April 26, 2010 edition of The Wall Street Journal. The Company intends to cooperate fully with the Committee's request for information related to the Company's historical home health operations. William Yarmuth, President and CEO of Almost Family, Inc., said, "We intend to fully cooperate with the Committee's request for information. Our Senior Advocacy mission calls for our caregivers to provide care based solely on patients' needs and clinical conditions and we are confident that when our data is thoroughly reviewed, it will provide a much clearer picture than was portrayed in The Wall Street Journal article."

50. On this news, Almost Family common stock dropped $3.22 per share, or 7.56%, on unusually high trading volume.

51. The truth was fully revealed through a second partial disclosure made in the Company's July 1, 2010, press release revealing that Almost Family was under investigation by the SEC and that the SEC had issued a civil subpoena for documents. The press release stated:

> Almost Family, Inc., a leading regional provider of home health nursing services, announced today that on June 30, 2010 it received a civil subpoena for documents and notice of investigation from the Securities and Exchange Commission. The subpoena seeks documents related to the Company's home health care services

21

and operations, including reimbursements under the Medicare home health prospective payment system, since January 1, 2000. The Company will supply the requested documents and cooperate fully with the SEC regarding the document request.

William Yarmuth, President and CEO of Almost Family, Inc., said, "Following an article on home health care in the April 27, 2010 edition of *The Wall Street Journal*, the U.S. Senate Finance Committee requested information from all of the publicly traded companies mentioned in that article. We have been cooperating fully with the Senate Finance Committee, and we will do the same with the SEC."

52. Also that day, *Dow Jones Business News* published an article entitled "SEC Probes Home-Health-Care Firms' Reimbursements," addressing the SEC's investigation into Almost Family:

Home-health-care providers Amedisys Inc. (AMED) and Almost Family Inc. (AFAM) are being investigated by the Securities and Exchange Commission, a month and a half after the U.S. Senate began inquiring into their Medicare reimbursement practices.

The investigations revolve around whether the companies pushed patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured them thousands more in reimbursements from the government's health-care program. That practice, which the companies say wasn't nefarious, was earlier brought to light by a Wall Street Journal article in April and followed up weeks later by requests from the U.S. Senate Finance Committee. Amedisys and Almost Family both said they will be cooperating with the SEC probe.

Two other peers, Gentiva Health Services Inc. (GTIV) and LHC Group (LHCG), were both involved in the Senate inquiry, but said they aren't under SEC investigation.

LHC spokesman Eric Elliott told Dow Jones Newswires the company hasn't "received anything or had any contact with SEC." And Gentiva put out a statement saying it hasn't received notice of formal investigation or received a subpoena.

An SEC spokesman declined to comment about any investigations.

The shares of each dropped sharply in a broadly lower market Thursday, though some analysts rushed to say, as they had last month, that the companies will ultimately be cleared. Still, the SEC's move appeared to raise more questions as it was an agency some weren't expecting to get involved, and led to concerns other government inquiries may be in the works.

Shares of Amedisys, the nation's largest home health-care company, slumped 14% to $37.87, while Almost Family slid 11% to $31.12. Gentiva was down 13% to $23.50 and LHC lost 10% to $24.91. The volumes on each were at least twice the average, while Amedisys was trading on eight times its typical volume.

The Senate had said it was focusing on whether the companies used extra visits, to get to 10 visits per patient, a level that would secure an additional $2,200 reimbursement from the government-run health-care program under a prior reimbursement schedule. When the rules were changed in 2008 to eliminate the $2,200 extra bonus in favor of incremental bonuses, a Wall Street Journal analysis found fewer patients were getting 10 visits.

The companies have said they were complying with Medicare requests by switching the practices, not using medically unnecessary visits simply for extra payouts.

53. After investors and the market learned of this SEC investigation, Almost Family's stock fell $3.88 per share, or 11.11%, on unusually high trading volume, reaching a low of $29.25 per share.

54. Through these disclosures, the market and investors learned the material adverse facts that Defendants had artificially inflated Almost Family's revenue and sales throughout the Class Period, in violation of the Federal Securities Laws and the Company's own Code of Ethics and Business Conduct, by billing patients for the more profitable in-home services and quantity of visits for which the Company would receive higher reimbursement rates from Medicare, regardless of patients' need for those services.

**LOSS CAUSATION**

55. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Almost Family common stock and operated as a fraud or deceit on Class Period purchasers of Almost Family common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were

disclosed and became apparent to the market, the price of Almost Family common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Almost Family common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

56. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Almost Family's business and financial prospects. Defendants' false and misleading statements had the intended effect and caused Almost Family common stock to trade at artificially inflated levels throughout the Class Period.

57. As a direct result of the disclosures made on May 13, 2010, and July 1, 2010, Almost Family common stock fell precipitously. These drops removed the artificial inflation from the price of Almost Family common stock, causing real economic loss to investors who had purchased Almost Family common stock during the Class Period.

58. The declines were a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in Almost Family common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Almost Family common stock and the subsequent significant declines in the value of Almost Family common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

59.     As alleged herein, Defendants acted with scienter in that each Defendant knew and/or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew and/or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Almost Family, their control over, and/or receipt and/or modification of Almost Family's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Almost Family, participated in the fraudulent scheme alleged herein.

60.     Defendants were motivated to materially misrepresent to investors the true financial condition of the Company because the scheme: (i) deceived the investing public regarding Almost Family's business, operations, and management and the intrinsic value of Almost Family common stock; (ii) enabled Defendant Guenthner to sell shares at artificially inflated prices; and (iii) caused Plaintiff and other members of the Class to purchase Almost Family common stock at artificially inflated prices.

## FRAUD ON THE MARKET PRESUMPTION

61. At all relevant times, the market for Almost Family's common stock was an efficient market that promptly digested current information with respect to the Company

from all publicly-available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

(a)     Almost Family's stock met the requirements for listing, and was listed and actively traded on the NASDAQ national market exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Almost Family filed periodic public reports with the SEC and the NASDAQ;

(c)     Almost Family regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Almost Family was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

62. Accordingly, Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Almost Family's common stock and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period. Additionally, Plaintiff and the Class are entitled to a presumption of reliance because the claims asserted herein against Defendants also are predicated upon omissions of material fact which there was a duty to disclose.

## NO SAFE HARBOR

63. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Almost Family who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Almost Family common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Almost Family common shares were actively traded on the NASDAQ. Almost Family has over 9 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the Class. Record owners and other members of the Class may be identified from records maintained by Almost Family or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      (a)     Whether the Exchange Act was violated by Defendants;

      (b)     Whether Defendants omitted and/or misrepresented material facts;

      (c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made not misleading;

      (d)     Whether Defendants knew of and deliberately disregarded that their statements were false and misleading;

      (e)     Whether the price of Almost Family common stock was artificially inflated; and

      (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

67. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in violation of federal law that is complained of herein.

68. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations Of § 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

69. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70. During the Class Period, Defendants originated and published the materially false and misleading statements specified above, which they knew or intentionally disregarded were misleading because they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or failed to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

72. Plaintiff and the Class, in reliance on the integrity of the market, have suffered damages in that they paid artificially inflated prices for Almost Family common stock. Plaintiff and the Class would not have purchased Almost Family common stock at the prices they paid, or at all, if they had been aware that defendants' misleading statements had artificially and falsely inflated the market prices.

29

73. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Almost Family common stock during the Class Period.

## COUNT II

**For Violations of § 20(a) of the Exchange Act**
**Against the Individual Defendants**

74. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75. The Individual Defendants acted as controlling persons of Almost Family within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the

power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77. As set forth above, Almost Family and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and approving Plaintiff's selection of counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


DATED: August 13, 2010


      /s/   Charles W. Miller

CHARLES W. MILLER

**MILLER & FALKNER**

Waterfront Plaza, Suite 2104
325 West Main Street
Louisville, KY 40202
Telephone: (502) 583-2300
Facsimile: (502) 583-2323
Email: cmiller@millerfalknerlaw.com


*Local Counsel for Plaintiff Blaze B. Huston*


KIM MILLER

**KAHN SWICK & FOTI, LLC**

500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com


LEWIS KAHN

**KAHN SWICK & FOTI, LLC**

206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com


*Counsel for Plaintiff Blaze B. Huston*